Charles Edwin **NEWSOM**, Appellant,

v.

**STATE of Alaska,** Appellee.

No. A–9984.

Court of Appeals of Alaska.

Jan. 9, 2009.

Rehearing Denied Feb. 9, 2009.

10.   152 P.3d 469 (Alaska App.2007).

11.   *Id.* at 472.

12.   *See* ch. 24, § 36(a), SLA 2007.

**1182**

Doug Miller, Assistant Public Advocate, Appeals & Statewide Defense Section, and Joshua Fink and Rachel Levitt, Public Advocates, Anchorage, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

In this case we are asked to clarify the scope of the investigative stops authorized under the search and seizure clause of the Alaska Constitution (Article I, Section 14) as interpreted in *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976). The question is whether *Coleman* allows police officers to conduct an investigative stop for the purpose of detaining and identifying a person who is suspected of being the driver of a vehicle who fled rather than submit to a traffic stop.

As we explain in more detail in this opinion, the officers in this case were in hot pursuit of the driver, the investigative stop was required as a matter of practical necessity, and the stop was conducted in a manner that was minimally intrusive. For these reasons, we conclude that the stop was lawful under the *Coleman* test as we interpreted that test in *State v. G.B.*, 769 P.2d 452 (Alaska App.1989).

We also reject Newsom's claims that the evidence presented to the grand jury was insufficient to support the indictment, and that the evidence presented at his trial was insufficient to support the jury's verdict.

*Underlying facts*

Just after midnight on October 29, 2005, Anchorage Police Officer Michael Busey turned on his overhead lights and attempted to perform a traffic stop of a car that was being driven without its headlights on. The driver of this car was later identified as the defendant in this case, Charles Edwin Newsom.

Rather than submit to the traffic stop, Newsom fled. Newsom accelerated, weaved

through traffic, and then made a sudden right turn onto an intersecting street. Busey concluded that it was too dangerous to chase Newsom, so he followed at a slower speed and thus lost sight of him.

While Newsom was out of Busey's sight, he took the opportunity to abandon his car in a nearby parking lot, and he then ran away toward a nearby Walmart store. As Newsom made his way toward the Walmart, Busey found the abandoned car. Busey broadcast a description of what had just occurred, including the fact that the driver had absconded (although Busey did not know in what direction). In this broadcast, Busey described the driver as a white adult male with dark (or dark brown) hair.

Two plainclothes officers who had just stopped to eat at a nearby restaurant responded to the summons for help. Because it was late at night, and because Walmart was one of the only stores in the vicinity that was still open, the two officers decided to check Walmart for the escaped driver.

As the two officers pulled into the Walmart parking lot, one of them (Officer Jeffrey Bell) noticed a man "walking hurriedly" from the direction of the northwest corner of the parking lot, heading toward the store entrance. This man caught Bell's attention for two reasons. First, the man appeared to be in a hurry to get into the store, and he was looking back over his shoulder as he entered. Second, the man was wearing shorts, even though the temperature was around 25 degrees.

Bell got out of his car and entered the Walmart to see if he could find this man or anyone else who matched the description broadcast by Officer Busey and who was acting suspiciously. Bell's partner, Sergeant Christopher Sims, remained in the car to meet Officer Busey and the other officers who had come to assist him.

When Bell got inside the store, he realized that the store was closing and that the store employees were "rounding people up to [get them to] exit the store, or to check out." Bell found the man in shorts that he had seen entering the store. He noticed that this man "didn't appear to be shopping"; rather, he was just "walking around, pacing.... [He] wasn't pushing a cart, [and he] didn't have anything in his hands". In addition, the man "looked nervous and frantic", and he appeared to be sweating even though he had removed his coat.

As Bell followed this man, the man headed back to the main exit (*i.e.*, the front entrance to the store). At this same time, Sergeant Sims was trying to enter the store. When a store employee tried to stop Sims by telling him that the store was closing, Sims (who, again, was in plain clothes) identified himself as a police officer who was looking for someone inside the store. Immediately after Sims identified himself as a police officer, Newsom turned around and essentially ran into Bell's arms. Bell caught him and held him. When Bell told Sims that he thought they had just caught the person they were looking for, Newsom responded by asking if it was illegal to be drunk.

It was now 12:17 a.m.—approximately seven minutes after Busey announced on the radio that he was halting his pursuit of the fleeing driver. Sims broadcast that he had detained a suspect, and that the suspect exhibited a "strong smell of alcohol". Bell and Sims remained with Newsom until Busey and witnesses from the parking lot were brought to the front of the store to identify Newsom. While they were waiting, Newsom told the officers, "I'll bet my girlfriend called me in [for] drunk driving again, didn't she?" Newsom also told the officers that they should just "take [him] to jail, [because he was] on probation anyway".

Essentially contemporaneously (at approximately 12:18 a.m.), police dispatch notified the officers that a woman had called the police just before midnight to report that her car had been stolen by her boyfriend. The woman did not identify herself, nor did she identify her boyfriend, but she did tell the police operator that the car was registered to her father, Terry Farr. When Officer Busey ran the license plates on the car that Newsom had abandoned, he found out that the registered owner was Terry Farr. Busey then called Mr. Farr, who identified his daughter's boyfriend as Charles Newsom.

Meanwhile, back at the Walmart store, Newsom was identified by two witnesses who had been in the Walmart parking lot when Newsom approached the store. These witnesses told the police that Newsom had walked up to their cars and had asked each of them for a ride—offering to pay $20 if they would take him a few blocks.

Additional confirmation of Newsom's identity as the driver of the car was provided by a police tracking dog, Bolo. After Busey broadcast his original report, Bolo's handler, Officer Aaron Whitt, drove to meet Busey at the location of the abandoned car. When Whitt arrived, he set Bolo tracking from the driver's side of the car, in an attempt to locate the driver. At essentially the same time that Sims and Bell were looking for the driver inside Walmart, Bolo was following the driver's trail to the north side of the Walmart store, and then to the main entrance of the store, where Whitt stopped him.

Newsom was ultimately convicted of first-degree (felony) failing to stop at the direction of a police officer under AS 28.35.182(a)(1)—i.e., a failure to stop accompanied by an act of reckless driving as defined in AS 28.35.400(a).[1] Newsom was also convicted of driving while his license was revoked or suspended.

*The primary issue presented on appeal: Does Coleman v. State allow the police to conduct an investigative stop under these circumstances?*

Officer Busey saw Newsom commit a traffic offense, and he also saw Newsom commit the crime of failing to stop at the direction of a police officer. Thus, Busey was authorized to arrest Newsom. If Busey had been able to keep Newsom in his sight and capture him, there would be no *Coleman* issue in this case—i.e., no issue involving an investigative stop.

But Newsom abandoned his car and absconded from the scene before Busey could locate the car. Minutes later, Newsom was stopped inside the nearby Walmart by two

other officers, Sims and Bell. These two officers knew (from Busey's radio report) that the driver of the abandoned car had failed to stop at Busey's direction, but they did not know for certain if the man they had stopped inside Walmart was the driver they were seeking.

An argument could be made that, given the information known to the community of police officers engaged in the chase—i.e., the totality of information known to Busey, Sims, Bell, and Whitt (Bolo's handler) at the time that Sims and Bell detained Newsom inside the Walmart store—there was probable cause to identify Newsom as the driver of the car (and, thus, legal justification to arrest Newsom). However, this argument would rest on a broad view of the "community of knowledge" doctrine.

When Sims and Bell went to Walmart and then located and detained Newsom, they were responding to Busey's report that the driver of the car had failed to stop and then had abandoned the vehicle and fled on foot. Along with the contents of this report, Sims and Bell relied on their own observations of Newsom's approach to the Walmart store and his behavior inside the store. But Sims and Bell were not subjectively aware of the additional information obtained by Busey and Whitt (aided by Bolo) after Busey broadcast his request for assistance.

The State argues that when a court assesses the validity of the investigative stop, the court may consider the totality of the information collectively known to all the officers engaged in the pursuit. But the case that the State cites for this proposition—*State v. Prater*, 958 P.2d 1110 (Alaska App.1998)—involved a different aspect of the "community of knowledge" doctrine. *Prater* involved an investigative stop of a suspected drunk driver that was prompted by a citizen's telephone report to the community REDDI program ("report every drunk driver immediately").[2] The issue in *Prater* was whether the investigative stop could be justified by information that was communicated to the police dispatcher by the citizen, but which the police

---

1. At the time of Newsom's offense, the reckless driving statute was numbered AS 28.35.040.

2. 958 P.2d at 1110–11.

dispatcher failed to specifically recite when the dispatcher broadcast the alert to the officers in the field.[3] We held that this information could be used to justify the stop.[4]

Newsom's case is different from *Prater* because, in Newsom's case, the State wishes to rely on a collectivity of knowledge that includes significant additional information separately obtained by Busey, as well as significant additional information separately obtained by Whitt (and Bolo), *after* Busey broadcast his request for assistance. The parties' briefs do not focus on this distinguishing factor, and we are hesitant to issue a decision on this point without pertinent briefing.

Moreover, as we explain in the remainder of this opinion, we conclude that the investigative stop of Newsom inside the Walmart store can be justified based on Busey's knowledge at the time of his broadcast and the additional information obtained by Sims and Bell when they responded to Busey's call for assistance. We will therefore resolve this appeal under the assumption that Sims and Bell did not have probable cause to arrest Newsom, but rather only reasonable suspicion that Newsom was the driver of the car.

Because Sims and Bell did not have probable cause to arrest Newsom, this means that their detention of Newsom constituted an investigative stop to determine whether Newsom was the driver of the car. And under the doctrine announced in *Coleman v. State*, Alaska law allows the police to conduct investigative stops only when imminent public danger exists or when the crime under investigation involves recent serious harm to persons or property. 553 P.2d at 46.

Newsom argues that, because *Coleman* limits investigative stops in this fashion, the investigative stop in his case was unlawful— since (according to Newsom) the facts of his case fail to satisfy either prong of the *Coleman* test.

In particular, Newsom contends that, at the time of the stop, he posed no danger to

anyone: his act of reckless driving was over, he had abandoned his girlfriend's car, and the car was already secured by police officers. Newsom further contends that, even though he may have committed a traffic violation (driving at night with his headlights off), as well as the more serious offense of failing to stop at the direction of a police officer, neither of these offenses involved serious harm to persons or property.

*Why we conclude that this investigative stop was lawful*

■ It is true that the text of the *Coleman* opinion suggests that there was insufficient justification for the investigative stop of Newsom inside the Walmart store. But in *State v. G.B.*, 769 P.2d 452 (Alaska App. 1989), this Court adopted a broad interpretation of the *Coleman* rule.

In *G.B.*, an employee of a video store saw the defendant standing on the side of the counter normally occupied by store employees. When the employee confronted G.B., G.B. ran from the store. The employee, suspecting that G.B. had just committed a theft, telephoned the police. By chance, a state trooper was nearby; almost immediately after hearing the police dispatch, the trooper observed a young man on foot who matched the store employee's description of the suspected thief. The trooper performed an investigative stop, and this stop led to the discovery of $800 in cash that the defendant had just stolen from the store.[5]

The superior court ruled that this investigative stop failed to meet the *Coleman* test. The superior court pointed out that, even though the theft turned out to be felony (*i.e.*, a theft of $500 or more)[6], the only supportable suspicion at the time of the stop was that G.B. had committed shoplifting or some other minor theft—a crime that posed no immediate danger to anyone, and that was not serious enough to qualify as recent "serious harm to persons or property".[7]

3.  *Id.* at 1111.

4.  *Id.* at 1113.

5.  *G.B.*, 769 P.2d at 453–54.

6.  *See* AS 11.46.130(a)(1) and 130(c).

7.  *G.B.*, 769 P.2d at 454.

On appeal, this Court reversed the superior court's ruling. We held that this reading of the two *Coleman* categories was "too rigid".[8]

In particular, we rejected the notion that *Coleman* categorically bars investigative stops for certain categories of crime. Instead, we held that even though "the theoretical seriousness of the crime [being investigated] is a significant factor" when applying the *Coleman* test, the seriousness of the crime "is not in itself determinative."[9] In particular, we declared that "[a] minimally intrusive stop based on solid information indicating that a crime is actually in progress or has just been completed may be justified under *Coleman* even when the crime itself is not a felony and involves harm that in other contexts might not seem particularly serious."[10]

We also explained that when a court analyzes these close or borderline cases, the court should focus on two principles highlighted by the *Coleman* decision. The first is to ensure that the police do not employ an investigative stop (*i.e.*, a temporary custody based merely on reasonable suspicion rather than probable cause) as a pretext to conduct a search for evidence. The second is to allow the police to perform temporary stops when "a prompt investigation [is] required as a matter of practical necessity".[11]

Applying this analysis to the facts of Newsom's case, we conclude that the investigative stop was lawful.

First, the police had solid information that the driver they were seeking had just committed the crime of eluding a police officer. In fact, even though Officer Busey did not immediately draw the conclusion that he had witnessed *first-degree* eluding (*i.e.*, a felony), the circumstances known to Busey at the time were sufficient to support this inference. Those same circumstances were sufficient to convince Newsom's trial jury, beyond a reasonable doubt, that Newsom had in fact committed the additional offense of reckless driving in his efforts to elude Busey, and that Newsom's offense was therefore a felony.

We also note that the police knew that the driver had abandoned the car and had fled on foot—circumstances indicating that something more serious was occurring than simply a driver wishing to avoid a traffic ticket.

Second, the investigative stop was essentially contemporaneous with the commission of the crime. As we explained above, the stop occurred approximately seven minutes after Busey announced on the radio that he was halting his immediate pursuit of the fleeing driver. Sims and Bell, the two officers who found Newsom inside Walmart, were acting in direct response to Busey's radio report. For all intents and purposes, they were acting on Busey's behalf in conducting a hot pursuit of the fleeing driver.

Third, the stop itself was minimally intrusive. Sims and Bell held Newsom for a few minutes until he could be more plainly identified as the driver of the abandoned car. Once there was probable cause to identify Newsom as the driver, the police were entitled to arrest him—and, thus, the ensuing detention of Newsom was no longer governed by *Coleman*.

Fourth, there was plainly a need for quick action if the driver of the car was to be apprehended before he or she left the immediate area. In the language of *Coleman* and of *G.B.*, a prompt investigation was required as a matter of practical necessity.

And fifth, nothing in the facts of Newsom's case suggests that the investigative stop was conducted as a pretext for a search of Newsom's person or belongings. Indeed, in Newsom's briefs to this Court, he does not even assert that the police searched him in any fashion during the investigative stop.

For these reasons, we conclude that the investigative stop of Newsom inside the Walmart store was lawful under *Coleman*, as interpreted in *G.B.*

**8.** *Id.* at 455.

**9.** *Id.*

**10.** *Id.* at 456.

**11.** *Id.* at 456, citing *Coleman*, 553 P.2d at 46.

*Newsom's argument that the grand jury evidence was insufficient to support the conclusion that he committed the offense of reckless driving in his efforts to elude Officer Busey*

■ Newsom challenges the sufficiency of the evidence presented to the grand jury with respect to the charge of felony eluding. In particular, Newsom argues that the evidence presented to the grand jury was not sufficient to support the conclusion that Newsom engaged in reckless driving in his efforts to elude Officer Busey.

■ When a defendant challenges the sufficiency of the evidence supporting an indictment, the test is whether the evidence heard by the grand jury, "if unexplained or uncontradicted, is adequate to persuade reasonable jurors or a judge to convict a person of the offense charged." *Wilkerson v. Division of Family and Youth Services*, 993 P.2d 1018, 1025 (Alaska 1999).[12]

As we explained above, a person commits felony eluding (*i.e.*, first-degree failure to stop at the direction of police officer) under AS 28.35.182(a)(1) if the person fails to stop at the police officer's direction and, in so doing, the person also commits the offense of reckless driving as defined in AS 28.35.400(a)—formerly numbered AS 28.35.040. This latter offense consists of "[driving] in a manner that creates a substantial and unjustifiable risk of harm to a person or to property"—with "substantial and unjustifiable risk" defined as "a risk of such a nature and degree that conscious disregard of it or failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."[13]

When Busey testified at the grand jury, he described his attempt to stop Newsom's car:

> *Officer Busey:* I got behind [the car and] . . . activated my overhead lights, and actually also turned on my spotlight. And as soon as I did that—there was actually a car in front of the vehicle and another one alongside it—[the car] accelerated and cut between the [other] two vehicles, and

[then] whipped around the one in front of it. And then, as it continued eastbound, [the car] turned [right] and went onto Denali [Street] over the curb.

Busey told the grand jury that he decided not to engage in an immediate pursuit of Newsom's car because he (Busey) "couldn't get between" the other two vehicles the way Newsom had—because "they were just too close together, and I wasn't going to take the chance of getting in a collision."

Given this testimony, the grand jurors could reasonably conclude that Newsom's driving constituted a "gross deviation from the standard of conduct that a reasonable person would observe"—in other words, that Newsom committed the offense of reckless driving in his efforts to elude Busey.

*Newsom's alternative argument that the trial evidence was insufficient to support the conclusion that he committed the offense of reckless driving in his efforts to elude Officer Busey*

■ Newsom alternatively claims that even if the grand jury evidence was sufficient to support a charge of felony eluding, the evidence presented at his trial was insufficient to support a guilty verdict on this charge. Again, Newsom's claim hinges on his assertion that the evidence was insufficient to establish that he committed reckless driving when he fled from Officer Busey.

At Newsom's trial, Busey was the only witness who testified regarding Newsom's driving. Busey testified that "[Newsom's] vehicle had . . . one vehicle right next to it and another one ahead of it"—and that, when Busey activated his overhead lights, Newsom "accelerated, cut between these [two other] vehicles, got ahead of [the] one, then cut back, and then . . . took a right turn onto [Denali Street] going southbound, and actually ran over the curb."

Busey testified that Newsom "[came] pretty close" to the other two cars—"within a car length of each of them". He added that he did not attempt to make the same maneuver

---

**12.** Citing *State v. Parks*, 437 P.2d 642, 644 (Alaska 1968), and Alaska Criminal Rule 6(q).

**13.** AS 28.35.400(a).

between the two other cars because he "was afraid [he] would strike one of them".

When a defendant challenges the sufficiency of the trial evidence to support a verdict, we are obliged to view the evidence in the light most favorable to upholding the verdict.[14] Viewing the evidence in that light, it is sufficient to support a finding that Newsom engaged in reckless driving under the definition formerly codified in AS 28.35.040 and currently codified in AS 28.35.400(a).

In the process of eluding Busey, Newsom accelerated, changed lanes quickly, darted between adjacent cars, and made a right turn so abruptly that his tires went over the curb in the process. Fortunately, Newsom did not cause an accident when he engaged in these maneuvers. Nevertheless, reasonable jurors could conclude that Newsom drove in a manner that created a risk of harm to persons or property, and that this risk was "of such a nature and degree that [Newsom's] conscious disregard of it or failure to perceive it constitute[d] a gross deviation from the standard of conduct that a reasonable person would observe in the situation." Accordingly, we conclude that the trial evidence was legally sufficient to support the verdict.

*Conclusion*

The judgement of the superior court is AFFIRMED.

**14.** *See, e.g., Eide v. State,* 168 P.3d 499, 500 (Alaska App.2007); *Simpson v. State,* 877 P.2d 1319, 1320 (Alaska App.1994).