John Todd RANTALA, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9769.

Court of Appeals of Alaska.

Sept. 18, 2009.

Marjorie Allard, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Blair M. Christensen, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

John Todd Rantala appeals his conviction for witness tampering.[1] This charge was based on three telephone conversations between Rantala and his domestic partner, Terri Mischler. Rantala, who was in jail on a charge of burglary, telephoned Mischler three times on the day before his burglary case was scheduled to come before the grand jury. The State alleged, and the trial jury found, that during these three telephone conversations Rantala "attempted to induce [Mischler] to testify falsely, [or] offer misleading testimony, or unlawfully withhold testimony" at the grand jury proceeding.

Rantala was originally charged with three separate counts of witness tampering, one count for each of the three telephone conversations. His trial on these charges ended without a decision, after the jury declared themselves hung on all three counts and Rantala's attorney requested a mistrial. Eight months later, the State filed a superseding information which contained a single, consolidated charge of witness tampering based on all three telephone conversations. At Rantala's second trial, he was convicted of this superseding count.

In the present appeal, Rantala claims that the trial judge at his first trial engaged in misconduct, and that the judge's actions misled the defense attorney into seeking a mistrial. Based on the assertion that his attorney was misled about the need for, or the advisability of, a mistrial, Rantala argues that the double jeopardy clause barred the State from bringing him to trial a second time for witness tampering.

1. AS 11.56.540(a)(1).

Rantala also argues in this appeal that the evidence presented at his trial was legally insufficient to establish the crime of witness tampering.

As we explain more fully in this opinion, we reject Rantala's double jeopardy claim. However, we also conclude that the evidence presented at Rantala's trial, even when viewed in the light most favorable to the jury's verdict, is insufficient as a matter of law to support a conviction for witness tampering. We must therefore reverse Rantala's conviction.

*Rantala's double jeopardy claim*

As we noted earlier, Rantala's first trial ended in a mistrial after the jurors returned to court and announced that they were hung on all three counts. In a note that the foreman handed to the trial judge when the jurors came back to the courtroom, the jurors gave the following breakdown of their position: on Count I, they were split 6 to 6; on Count II, they were split 6 for conviction, 3 for acquittal (with 3 apparently undecided); and on Count III, they were split 9 for conviction and 3 for acquittal.

Based on this information, both the prosecutor and the defense attorney agreed that the jurors would be unable to reach any verdicts, and the defense attorney requested a mistrial. The trial judge, Superior Court Judge Harold M. Brown, granted this request.

However, a few minutes *before* the jury returned to court and told Judge Brown that they were unable to reach a verdict on any of the three counts, the jury took an action that was seemingly inconsistent with their later declaration that they were hung: they sent the judge a completed verdict form on one of the counts (Count I). This verdict form declared that the jurors had found Rantala "Not Guilty" on Count I.

Judge Brown notified the parties that he had received this completed verdict form, and that this form apparently contained the jury's verdict on Count I, but Judge Brown did not tell the parties what that verdict was. Instead, the judge told the parties that he intended to send the verdict form back to the jury, with an instruction that the jurors should submit their verdicts on all three counts at the same time.

The prosecutor immediately responded, "I agree." Rantala's attorney's only response was to point out that it was ten minutes before 9:00 p.m., the time at which Judge Brown intended to let the jurors go home for the night.

There was a pause in the proceedings while Judge Brown composed his note to the jurors. When the judge was finished, he read the note aloud to the two attorneys. Neither attorney objected to (or even commented on) what the judge had written. Judge Brown then sent the following note to the jury:

Jurors: I am returning the verdict form to you. I have not announced your verdict to the parties. You should return your verdict on all counts at the same time. I will ask you as a group to come back into court at 9 p.m. to consider whether it would be fruitful to continue deliberations tonight or whether we should return at 9 a.m. tomorrow to continue deliberations.

This note bears the time "8:50 p.m.", but the log notes of the proceeding show that the court went off-record (assumedly, so that this note could be sent to the jury) at 8:55 p.m. Just under ten minutes later, at 9:04 p.m., the court reconvened with the jurors present in the courtroom. At that time, the jury foreman handed Judge Brown the note which declared that the jurors were split along the lines described in the first paragraph of this section. We note, in particular, the fact that the jurors declared themselves split 6 to 6 on Count I—the very count on which the jurors, seemingly, had been in unanimous agreement only minutes before.

Moreover. (as Judge Brown immediately revealed to the parties), the jury foreman made a verbal comment when he handed Judge Brown the note that contained the breakdown of the jurors' positions: the foreman told the judge that, in his opinion, the jury was "hopelessly hung".

When the prosecutor and the defense attorney were apprised of the jury's numerical breakdown, and of the foreman's comment,

they agreed that it was pointless to ask the jurors to continue deliberating. The defense attorney then moved for a mistrial, which Judge Brown granted.

Two weeks later, Rantala (now represented by a new attorney) filed a motion in which he argued that, under the double jeopardy clause, Count I had to be dismissed. Rantala asserted that Judge Brown committed error by failing to inform the parties of the content of the jury's premature verdict on Count I— i.e., by failing to inform the parties that the jury had apparently voted to acquit Rantala on this count. Rantala argued that if his defense attorney had been aware of the apparent acquittal on Count I, the defense attorney either would not have requested a mistrial when the jury returned to court ten minutes later and declared themselves hung, or the defense attorney at least would have insisted on polling the jurors before he asked for the mistrial.

Based on the foregoing argument, Rantala asserted that his defense attorney's request for a mistrial did not constitute a "knowing" or "intelligent" waiver of Rantala's double jeopardy rights on Count I—and that, therefore, the State was barred from bringing Rantala to trial again on Count I.

Rantala did not offer an affidavit from his trial attorney in support of this motion, nor did he seek an evidentiary hearing. Judge Brown denied the motion without comment.

As explained above, Rantala was later tried a second time—this time, on the single consolidated count—and the jury found him guilty.

On appeal, Rantala renews his argument that Judge Brown should have apprised the parties that the jury foreman had written "Not Guilty" on the verdict form for Count I. This time, however, Rantala argues that he is entitled to more than simply dismissal of the charge in former Count I (the charge based on the first telephone conversation). Rantala now argues that he is entitled to dismissal of the entire case, and to an order barring the State from reinstituting the charges based on the second and third telephone conversations.

Rantala's briefs to this Court present the argument that Judge Brown had no authority to reject what was apparently a valid verdict on Count I. According to this argument, Judge Brown was obligated to enter judgement on this verdict, even though it was only a partial resolution of the charges, and the judge therefore acted illegally when he sent the verdict form back to the jury and directed the jury to return all three verdicts at the same time. However, Rantala's attorney withdrew this claim at the oral argument in this case.

■ Rantala's briefs also present an alternative argument that was not raised in the superior court: the argument that even if Judge Brown had the authority to ask the jurors to return their verdicts on all three counts at the same time, the judge's note to the jury was worded improperly—worded in such a way as to imply that the judge refused to accept the jurors' apparent decision on Count I, and that the judge was ordering the jurors to reconsider that decision.

We reject this alternative argument. The text of Judge Brown's note does not appear coercive on its face; it merely informs the jurors that they should return all three of their verdicts at the same time. Moreover, as we explained earlier, Judge Brown read the content of this note, verbatim, to the two attorneys before he sent the note to the jury, and Rantala's defense attorney had no objection to either the substantive content of the note or to the judge's wording. Judge Brown committed no error, much less plain error, when he composed this note and sent it to the jury.

This leaves Rantala's last claim: that Judge Brown, by failing to disclose the content of the verdict form on Count I, unlawfully misled Rantala's defense attorney about the status of the jury's deliberations—thus preventing the defense attorney from making an informed decision about whether to seek a mistrial when, ten minutes later, the jury announced that they were hopelessly divided on all three counts.

We reject this argument because it is not supported by the record. There is no indication that the defense attorney was misled.

The defense attorney knew that the jurors declared themselves unable to decide Ranta-

la's case. In particular, the defense attorney knew that the jurors declared themselves split 6 to 6 on Count I. The defense attorney also knew that, ten minutes before the jurors returned to court and announced themselves deadlocked, the jury had sent Judge Brown a verdict form that apparently contained the jury's verdict on this same count. The defense attorney knew this because, as soon as Judge Brown received the verdict form, he announced this fact in open court.

The defense attorney also knew what had happened to that verdict: he was aware of (and apparently approved of) Judge Brown's decision to return the verdict form to the jurors, accompanied by an instruction that they should return their verdicts on all three counts at the same time.

█ Generally, litigants waive their right to challenge a verdict procedure unless they raise their objection before the jury is discharged.[2] If Rantala's trial attorney thought that he needed to know the content of the verdict form before he decided whether to seek a mistrial, he could have asked Judge Brown to reveal that information. Alternatively, the defense attorney could have requested Judge Brown to ask the jurors why they now declared themselves hung when, only minutes before, they had returned a verdict on one of the counts.

But the defense attorney chose not to pursue this matter in either of the ways suggested in the preceding paragraph, or in any other fashion. Instead, he pronounced himself satisfied that the jury was truly deadlocked, and he asked for a mistrial.

█ On appeal, Rantala implies that his trial attorney acted incompetently when he asked Judge Brown to declare a mistrial even though he did not know the content of the verdict form. According to Rantala, this information was crucial to any informed decision on the matter of a mistrial.

An attorney's decision to ask a trial judge to declare a mistrial is obviously a tactical decision. The law presumes that an attor-

ney's decisions are competent, and that they are motivated by sound tactical considerations.[3] Thus, it is Rantala's burden to affirmatively establish that no competent defense attorney would have decided to seek a mistrial without knowing the content of the previously submitted verdict form.

As we noted earlier, Rantala has not offered an affidavit from his trial attorney, or any other evidence, to support the assertion that his attorney was misled or that his attorney was otherwise unable to make a competent tactical decision regarding whether to request a mistrial. Rantala rests his claim solely on the record of the trial proceedings.

That record does not address or explain the defense attorney's tactical analysis of the situation. Moreover, it was not patently incompetent for Rantala's attorney to seek a mistrial in this situation. Accordingly, Rantala failed to rebut the presumption that his attorney acted competently when he asked for a mistrial.

For these reasons, we reject Rantala's claim that his second trial was held in violation of the double jeopardy clause.

### The sufficiency of the evidence to support Rantala's conviction for witness tampering

At Rantala's second trial (the trial that led to the judgement that Rantala challenges in this appeal), the prosecution and the defense each presented one witness. The prosecution presented the testimony of the state trooper who arrested Rantala for burglary and who later obtained the search warrant that authorized the seizure of the recordings of Rantala's three telephone calls to Terri Mischler from jail. The defense presented the testimony of Mischler, who asserted that Rantala never asked her to testify falsely or to withhold testimony. However, the primary evidence in the case was the audio recordings and accompanying transcripts of Rantala's three telephone calls to Mischler.

**2.** *See Griffith v. Taylor,* 12 P.3d 1163, 1169 (Alaska 2000); *Gravel v. State,* 499 P.2d 1022, 1025 (Alaska 1972); *Roberts v. State,* 680 P.2d 503, 507 (Alaska App.1984).

**3.** *Smith v. State,* 185 P.3d 767, 768 (Alaska App. 2008); *State v. Jones,* 759 P.2d 558, 569 (Alaska App.1988).

Here is the factual background of these telephone calls: Rantala and Mischler had been living together, along with Mischler's two children from a prior relationship. Rantala moved out of the residence after the state Office of Children's Services obtained a restraining order that prohibited Rantala from contacting Mischler's two children. This restraining order was issued in November 2003, and it was valid for the next six months—in other words, until May 2004.

On March 12, 2004, Rantala returned to Mischler's house. When Mischler refused to let him inside, Rantala entered through a window. Mischler took her two children to a friend's house, where she called the state troopers. The trooper who responded to the scene found Rantala hiding underneath Mischler's house; the trooper had to use pepper spray to get Rantala to surrender. Based on this incident, Rantala was arrested and charged with burglary (a felony) as well as six misdemeanors.

Rantala's burglary charge was scheduled to be heard by the grand jury on March 19, 2004. Rantala called Mischler from jail three times on March 18th: one call at 9:32 in the morning, another at 10:16, and a third at 1:25 in the afternoon. All told, these three phone calls comprise 36 minutes of conversation between Rantala and Mischler.

In each of these conversations, Rantala and Mischler discussed the impending grand jury hearing. Rantala told Mischler that, even though he broke into her house, he was not a bad person and he did not deserve to be convicted of a felony (i.e., the burglary charge). Rantala repeatedly appealed to Mischler's sympathies, urging her not to cooperate with the authorities in their attempts to pursue the burglary charge.

Standing alone, these statements do not constitute the crime of witness tampering as defined in AS 11.56.540(a)(1). Under this statute, the State was required to prove that Rantala attempted to induce Mischler to "testify falsely", or to "offer misleading testimony", or to "unlawfully withhold testimony" at the grand jury proceeding.

During the State's summation to the jury at Rantala's trial, the prosecutor asserted that Rantala violated this statute when he said three different things to Mischler during the telephone conversations. On appeal, the State again relies on these same three statements as constituting the *actus reus* of the crime.

█ The State first asserts that Rantala violated the witness tampering statute when, during his second conversation with Mischler, he told Mischler that she did not have to testify against him at all if she had not been subpoenaed to appear before the grand jury:

> *Rantala:* Did they subpoena you?
>
> *Mischler:* No.
>
> *Rantala:* Then you don't even have to say anything to them.
>
> [Rantala and Mischler then engage in a discussion about what the Office of Children's Services was likely to do if they learned that Mischler was not cooperating in the prosecution of Rantala.]
>
> *Rantala:* That's why you should have never called the Troopers.
>
> *Mischler:* Well, you know what? I did. All right? So don't sit [t]here and say, "You shouldn't have done this or shouldn't have [done] that." ... All right?
>
> *Rantala:* You still don't have to testify in front of the grand jury if they didn't subpoena you. You just tell them, "No, I don't have anything to say." That way, they won't indict me [on] this.
>
> ...
>
> *Rantala:* You don't have to say anything. Just say, "I don't wish to testify." They didn't subpoena you; you don't have to testify.

The State asserts that, by making these statements to Mischler, Rantala was attempting to induce Mischler to "withhold testimony" in violation of the statute. But contrary to the State's position, Rantala's statements do not constitute the crime of witness tampering.

The witness tampering statute does not forbid attempts to induce a witness to "withhold testimony". Rather, the statute forbids attempts to induce a witness to "*unlawfully* withhold testimony". It is not unlawful for a

person to decline to testify if they have not been subpoenaed or otherwise ordered to appear. Therefore, it is not witness tampering to advise a person of this fact, or to encourage a person to exercise their right to decline to testify if they have not been subpoenaed.

The legislative commentary to AS 11.56.540 addresses the related issue of whether it is witness tampering to try to convince a prospective witness to avoid the service of a subpoena (so that the witness will not have to testify). The commentary expressly declares that it is not a violation of the witness tampering statute for a person "[to] attempt to induce a prospective witness to avoid process". The commentary explains:

> While AS 11.56.510 [i.e., the "Interference with Official Proceedings" statute] makes it unlawful to use a bribe or threat to induce a witness to avoid legal process, AS 11.56.540 does not bar an attempt to achieve that objective by persuasion or argument. A defense attorney, for example, would not be prohibited from attempting by persuasion or pleading to induce a witness to avoid [service of] process by leaving the state.

1978 Senate Journal, Supplement No. 47 (June 12), pp. 81–82.

Based on this commentary, we conclude that Rantala did not violate the witness tampering statute either when he advised Mischler that she did not have to testify before the grand jury if she had not been subpoenaed, or when he urged Mischler not to testify voluntarily.

 The State next asserts that Rantala violated the witness tampering statute when, during his second conversation with Mischler, he urged Mischler to tell the authorities that she did not wish to pursue the prosecution against him:

> Rantala: You could say, "Well, I don't even want to pursue this." And they can't do anything about it. Then I can go to

court . . . [and] plead guilty to [the related] misdemeanors, and you'll be out of it. You won't have to deal with this anymore. You understand what I want, [what I'm] trying to do here?

Again, the State asserts that this statement was an attempt to induce Mischler to unlawfully withhold testimony. This is simply wrong. In the above-quoted statement, Rantala did not say anything about whether Mischler should testify. Rather, Rantala asked Mischler to tell the authorities (whether she testified or not) that she did not wish to pursue the case against Rantala.

The Supreme Court of Washington confronted this same issue in *State v. Rempel*, 114 Wash.2d 77, 785 P.2d 1134 (1990). The defendant in *Rempel* was arrested for attempting to rape a female acquaintance; he called the victim from jail several times following his arrest.[4] During these phone conversations, Rempel told the victim that he was sorry, that he would never do it again, and that the rape charge would ruin his life.[5] He repeatedly asked her to drop the charges.[6]

Under Washington's witness tampering statute, RCW § 9A.72.120, it is a crime to induce a witness to testify falsely or to unlawfully withhold testimony.[7] Rempel was prosecuted under the theory that he violated this statute when he asked the victim to drop the charges. The Washington Supreme Court held that, given the context of Rempel's conversation with the victim, his statements did not (as a matter of law) constitute witness tampering:

> [Rempel's] words do not contain a request to withhold testimony. . . . The words "drop the charges" reflect a lay person's perception that the complaining witness can cause a prosecution to be discontinued. [Rempel] maintained this [false] belief even after [the victim] told him that she did not have any control over the matter.

---

4. *Rempel*, 785 P.2d at 1135.

5. *Id.*

6. *Id.* at 1135–36.

7. This statute is quoted in *Rempel*, 785 P.2d at 1136 n. 1.

[We acknowledge that] an attempt to induce a witness to withhold testimony does not depend only upon the literal meaning of the words used. The State is entitled to rely on the inferential meaning of the words and the context in which they were used ... includ[ing] the prior relationship between [the defendant] and [the witness], and [the witness's] reaction to the [words]. [But the] entire context [in this case] negates any inference that [Rempel's] request to "drop the charge" was in fact an inducement to withhold testimony from a later trial.

. . .

We do not hold that the words "drop the charges" [cannot] sustain a conviction [for witness tampering,] if uttered in a factual context that would lead to a reasonable inference that the speaker actually attempted to induce a witness to [unlawfully] withhold testimony. Given the context here, however, we conclude that no such inference can be drawn. The evidence does not support [Rempel's] conviction.

*Rempel,* 785 P.2d at 1137.

Rantala's statement to Mischler was analogous to the "drop the charges" request made by the defendant in *Rempel.* Rantala told Mischler, "You could say, 'Well, I don't even want to pursue this.' And they can't do anything about it." Like the defendant in *Rempel,* Rantala apparently believed that the burglary prosecution could not go forward without Mischler's consent.

But asking the victim of a crime to tell the authorities, "I don't even want to pursue this [criminal prosecution]" is not the same thing as asking the victim to testify falsely or to unlawfully withhold testimony if the victim is subpoenaed and called to the stand. There is no inconsistency between a victim's publicly declaring that they do not wish to see the defendant prosecuted, and the victim's honoring their duty to testify.

Like the Washington Supreme Court, we do not say that Rantala's words to Mischler (or similar words) could never sustain a conviction for witness tampering. Sometimes,

the context of a conversation will add layers of meaning that would not ordinarily be present in the words themselves.

See, for instance, *State v. Frank,* unpublished, 1999 WL 155946 (Wash.App.1999), a case in which a nine-year-old boy was being sexually abused by his parents. The boy's mother told him that he would go to jail if he kept on "telling lies" or "making stuff up" about the abuse.[8] The Washington Court of Appeals held that, even though the mother's words, taken literally, were an admonition not to tell lies, the real import of the mother's words—given the context of the conversation and the relationship between the two participants—was to communicate a threat whose purpose was to induce her son to testify falsely or unlawfully withhold testimony.[9]

But Rantala's words to Mischler do not support any inference of a hidden subtext. Like the defendant in *Rempel,* Rantala essentially asked Mischler to tell the authorities that she wanted to drop the burglary charge. This statement was not a request, or even a suggestion, that Mischler lie about what happened or that she unlawfully withhold testimony if the burglary case went forward and she was subpoenaed to testify. Accordingly, we conclude that Rantala did not violate the witness tampering statute when he made this request to Mischler.

■ Finally, the State asserts that Rantala violated the witness tampering statute when, during the second and third phone conversations, he suggested that if Mischler decided to testify at the grand jury, she should confine herself to "yes" or "no" answers and should not volunteer information that was not directly solicited by the prosecutor's questions:

> *Rantala:* Just say "yes" or "no" to them.
>
> . . .
>
> [W]hatever you do, don't elaborate on anything. If you're going to say anything, just say "yes" or "no".
>
> . . .

---

**8.** *Id.,* 94 Wash.App. 1047, 1999 WL 155946 at *12.

**9.** *Id.*

Just answer "yes" or "no". Don't go into a whole bunch of—if you do [testify], do that.

The State asserts that when Rantala advised Mischler to confine herself to "yes" or "no" answers, and not to volunteer information, he was in effect asking Mischler to "offer misleading testimony" or to "unlawfully withhold testimony". The State offers two arguments as to why Rantala's advice to Mischler constituted witness tampering.

The State's first argument is that Rantala's words, taken literally, constituted a request that Mischler answer only "yes" or "no" to any and all questions—even questions that clearly called for a narrative answer (questions such as "What happened next?"). This suggested interpretation of Rantala's words is simply not reasonable.

As can be seen from the above-quoted excerpts, Rantala did not ask Mischler to answer only "yes" or "no" to any and all questions. Rather, he urged Mischler to answer as simply and concisely as possible: "[D]on't elaborate on anything. If you're going to say anything, just say 'yes' or 'no'. . . . Just answer 'yes' or 'no'. Don't go into a whole bunch of . . ." (apparently, a "whole bunch" of explanation or detail).

We acknowledge that the State is entitled to rely on any reasonable inference from the evidence. But in this instance, the State's suggested interpretation of Rantala's words is not plausible. It is simply unreasonable to interpret Rantala's words as a request for Mischler to confine herself to "yes" or "no" answers even when, given the prosecutor's question, such an answer would be nonsensical or non-responsive.

The State's second argument is that, when Rantala asked Mischler to refrain from elaborating when she answered questions, and to simply answer "yes" or "no" to the extent possible, Rantala was effectively asking Mischler to "unlawfully withhold testimony".

The State contends that if Mischler followed Rantala's suggestion, she would be violating her oath as a witness—her oath to tell "the whole truth".

In the courts of Alaska, witnesses are required (before they commence their testimony) to take an oath or to otherwise affirm (*i.e.*, declare without swearing an oath to a deity) that they "will testify truthfully". Alaska Evidence Rule 603.

Alaska law does not prescribe an exact formula for this oath or affirmation; rather, Evidence Rule 603 merely states that the oath or affirmation shall be "administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to [testify truthfully]." However, Alaska courts traditionally employ the formula, "You do solemnly swear [or affirm] that, in the cause now before this Court, you will tell the truth, the whole truth, and nothing but the truth . . . ?" [10]

This formula is several centuries old.[11] It is, of course, designed to remind witnesses to answer truthfully, and to encourage witnesses to be open and honest in their testimony. However, the State's argument in Rantala's case requires us to examine whether witnesses, when they swear to tell "the whole truth", undertake a legal duty to answer all questions as fully as possible—or whether, as suggested by the wording of Evidence Rule 603, witnesses have the more circumscribed duty to "testify truthfully".

The answer to this question has implications far beyond Rantala's case.

This Court takes judicial notice that, when attorneys prepare friendly witnesses for cross-examination at a trial or evidentiary hearing, the attorneys will often advise their witnesses to follow the approach that Rantala suggested to Mischler in this case. That is, the attorneys will advise their witnesses to testify truthfully, but to answer "yes" or "no" to the extent possible, and to refrain from

---

**10.** Quoted in *Flores v. State*, 443 P.2d 73, 75 (Alaska 1968).

**11.** For example, the English *Book of Oaths* dated 1649 contains the following "Oath of Evidence upon the Arraignment of the Prisoner at the Barre": "The evidence that you shall give to this inquest against the prisoner at the barre, shall be the truth, and the whole truth, and nothing but the truth as neere as God shall give you grace." (Quoted in John Henry Wigmore, *Evidence in Trials at Common Law* (Chadbourn rev'n, 1976), § 1818, Vol. 6, p. 389.)

volunteering information that is not actually required by the cross-examiner's questions.

This Court also takes judicial notice that the success or impact of cross-examination often hinges on getting an adverse witness to answer the lawyer's questions directly and simply, without qualification or elaboration. Lawyers will often direct adverse witnesses to confine themselves to "yes" or "no" answers, even when the witness clearly wants to qualify or elaborate on their answer. Indeed, trial judges will often come to the aid of the cross-examiner in these instances, ordering a witness to refrain from adding explanations or qualifications, and directing the witness to simply answer "yes" or "no" unless the question can not fairly be answered in that manner.

Under the State's suggested interpretation of the law, all three of these participants in the legal process—the attorney preparing a witness for cross-examination, the cross-examiner, and the trial judge—would apparently be subject to prosecution for witness tampering under the theory that they were trying to induce the witness to refrain from divulging "the whole truth".

The fact that the State's suggested interpretation of the law leads to this odd result—a result so inconsistent with current litigation practices—is probably a sufficient reason, in and of itself, to reject the State's approach to this issue. There is, moreover, a United States Supreme Court decision on a related issue (the definition of perjury) that counsels us to reject the State's suggested interpretation of the witness tampering statute. The case is *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973).

The defendant in *Bronston* was the sole owner of a company that declared bankruptcy.[12] During a hearing in bankruptcy court, while Bronston was being questioned about the extent and location of his company's assets, he gave an answer that was literally true, but not responsive to the question. Moreover, the implications of Bronston's answer were misleading:

*Attorney for a creditor:* Do you have any bank accounts in Swiss banks, Mr. Bronston?

*Bronston:* No, sir.

*Attorney:* Have you ever?

*Bronston:* The company had an account there for about six months, in Zurich.

*Attorney:* Have you any nominees [*i.e.,* agents] who have bank accounts in Swiss banks?

*Bronston:* No, sir.

*Attorney:* Have you ever?

*Bronston:* No, sir.

*Bronston,* 409 U.S. at 354, 93 S.Ct. at 598.

In fact, although Bronston stated truthfully that he had no Swiss bank account at the time of the bankruptcy court hearing, Bronston had previously maintained a personal Swiss bank account for nearly five years. Based on this fact, and based on the above-quoted answers, Bronston was convicted of perjury. *Id.*

The legal problem that prompted the Supreme Court to review Bronston's case was this: Bronston was asked whether *he* had ever had a Swiss bank account. His answer to this question was non-responsive: he replied that his *company* had had an account in Switzerland for six months. This answer was literally true, but it did not answer the attorney's question, and it could be interpreted as implying that *Bronston* had never had a Swiss bank account.

The government based its perjury prosecution on the theory that, even though Bronston's answer to the question was true, Bronston intended to mislead his creditors and the bankruptcy court—by unresponsively addressing his answer to his *company's* bank accounts rather than his own.[13] In conformity with the government's theory of prosecution, the jury at Bronston's trial was instructed that Bronston could properly be convicted of perjury if his answer, "[although] not literally false", "nevertheless constitute[d] a false statement" when evaluated "in the context in which it was given".[14]

12. *Bronston,* 409 U.S. at 353, 93 S.Ct. at 597.

13. *Id.,* 409 U.S. at 355, 93 S.Ct. at 598.

14. *Id.*

The Supreme Court concluded that this was not a proper basis for a perjury conviction under the federal statute, 18 U.S.C. § 1621. The Court first noted that, although the federal perjury statute prohibits a witness from willfully making false statements under oath, it does not prohibit a witness from willfully making a *true* statement "that *implies* any ... matter that [the witness] does not believe to be true." *Bronston,* 409 U.S. at 357–58, 93 S.Ct. at 599 (emphasis in the original quote).

The Court acknowledged that the government's suggested reading of the perjury statute might advance the accuracy of the factfinding process,[15] but the Court concluded that other important policies required a narrower definition of perjury.

The Court first noted that it was doubtful whether Congress intended the federal government to employ perjury prosecutions "to cure ... testimonial mishap[s] that could readily [be corrected] with a single additional question by counsel alert—as every examiner ought to be—to the incongruity of [a witness's] unresponsive answer." [16].

Next, the Court observed that most unresponsive answers do not stem from a witness's desire to subvert justice, but rather from "the pressures and tensions of interrogation":

> [I]t is not uncommon for the most earnest witnesses to give answers that are not entirely responsive. Sometimes the witness does not understand the question, or [the witness] may[,] in an excess of caution or apprehension[,] read too much or too little into it. [And it] should come as no surprise that a participant in a bankruptcy proceeding may have something to conceal and consciously [try] to do so, or that a debtor may be embarrassed at his plight and yield information reluctantly.

*Bronston,* 409 U.S. at 358, 93 S.Ct. at 600. The Court declared that our legal system's primary cure for these problems is the adversarial process itself:

> It is the responsibility of the lawyer to probe[.] .... [I]nterrogation, and cross-examination in particular, is a probing, prying, pressing form of inquiry. If a witness evades, it is the lawyer's responsibility to recognize the evasion and bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination.

*Bronston,* 409 U.S. at 358–59, 93 S.Ct. at 600.

The Court recognized that, in some instances, a witness who fails to give a responsive answer may be consciously attempting to mislead their examiner and the court or jury.[17] But the Court concluded that "[a] jury should not be permitted to engage in conjecture [as to] whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner." [18] The Court explained:

> To hold otherwise would be to inject a new and confusing element into the adversary testimonial system we know. Witnesses would be unsure of the extent of their responsibility for the misunderstandings [or the] inadequacies of examiners, and might well fear having that responsibility tested by a jury [in a perjury prosecution] under the vague rubric of "intent to mislead" or "perjury by implication." ... [T]he measures taken against the offense [of perjury] must not be so severe as to discourage witnesses from appearing or testifying.... [T]he obligation of protecting witnesses from oppression ... by charges, or threats of charges, of having borne false testimony, is far paramount to that of giving ... perjury its deserts.

*Bronston,* 409 U.S. at 359, 93 S.Ct. at 600 (citations and internal quotation marks omitted).

For these reasons, the Supreme Court concluded that the federal perjury statute should not be construed so broadly as to allow the government to "[invoke it] simply because a wily witness succeeds in derailing the questioner [by] speak[ing] the literal

**15.** *Id.,* 409 U.S. at 358, 93 S.Ct. at 600.

**16.** *Id.*

**17.** *Id.,* 409 U.S. at 359, 93 S.Ct. at 600.

**18.** *Id.*

truth." [19] Rather, "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." [20]

For state court decisions that have adopted the *Bronston* approach when interpreting their own perjury statutes, see *In re Rosoto*, 10 Cal.3d 939, 112 Cal.Rptr. 641, 647–48, 519 P.2d 1065, 1071–72 (1974); *Cabe v. Superior Court*, 63 Cal.App.4th 732, 74 Cal.Rptr.2d 331, 336–38 (1998); *State v. Forbes*, 918 S.W.2d 431, 444 (Tenn.Crim.App. 1995); *People v. Neumann*, 51 N.Y.2d 658, 435 N.Y.S.2d 956, 959–960, 417 N.E.2d 69, 72 (1980); *State v. Olson*, 92 Wash.2d 134, 594 P.2d 1337, 1340 (1979); *State v. Stump*, 73 Wash.App. 625, 870 P.2d 333, 335 (1994).

In general, see the Annotation, "Incomplete, Misleading, or Unresponsive But Literally True Statement as Perjury", 69 A.L.R.3d 993 (1976).

Our purpose in undertaking this lengthy review of the *Bronston* decision is not to adopt a similar interpretation of Alaska's perjury statute; that issue is not before us. Rather, we have discussed *Bronston* because we believe that the Supreme Court's reasoning in *Bronston* is an apt response to the State's argument in this case.

As we explained earlier, the State argues in this case that a witness violates their oath if their answers fail to disclose the "whole truth" (*i.e.*, all details of the witness's knowledge that are relevant to the questions asked)—and, thus, anyone who advises or encourages a witness to give such answers is guilty of witness tampering.

If we were to adopt this view of the law, we would (in the words of *Bronston*) "inject a new and confusing element" into our legal system. The people who prepare and advise witnesses (for instance, attorneys, business associates, family members, and friends) would operate under the fear of criminal penalties, or at least the threat of criminal prosecution, for saying things which might later be construed as advising or encouraging the witness not to volunteer some aspect of their knowledge—even if these people un-

equivocally advised the witness to tell the truth.

Such a rule would fundamentally alter our adversarial process. Obviously, there are many instances when a witness's honest answers will not reveal the "whole truth" known to the witness. But that is what direct examination and cross-examination are for.

■ For these reasons, we reject the State's argument that a person commits witness tampering, as defined in AS 11.56.540(a)(1), if the person advises the witness to give "yes" or "no" answers whenever reasonably possible, and not to volunteer information or elaborate on their answers if this extra information is not solicited by the examiner's questions.

We have now examined—and rejected—all of the State's arguments as to why the evidence at Rantala's trial might be sufficient to support his conviction for witness tampering. We now address the additional argument raised by our dissenting colleague.

In Judge Bolger's dissent, he argues that Rantala could properly be convicted of witness tampering because he advised Mischler that she could "just tell them, 'No, I don't have anything to say'." Judge Bolger suggests that, in the light most favorable to the State, Rantala's words could be likened to the conduct that was deemed sufficient to support a witness-tampering charge in *Boggess v. State*, 783 P.2d 1173 (Alaska App. 1989).

The defendant in *Boggess* urged his wife to improperly claim the Fifth Amendment privilege (*i.e.*, claim the privilege against self-incrimination even though her answers would not tend to incriminate her). He also asked his wife to just "break down and cry" rather than answer questions that would elicit information unfavorable to him. *Id.* at 1175. We held that this conduct was a proper basis for a witness-tampering conviction. *Id.* at 1181.

It is true that Rantala said to Mischler, "You just tell them, 'No, I don't have anything to say'." But those words must be

---

**19.** *Id.,* 409 U.S. at 360, 93 S.Ct. at 601.

**20.** *Id.*

read in context. What Rantala said to Mischler is this:

> *Rantala:* You still don't have to testify in front of the grand jury if they didn't subpoena you. You just tell them, "No, I don't have anything to say." That way, they won't indict me [on] this.

In other words, Rantala was urging Mischler to tell the authorities that, absent a subpoena, she had nothing to say to them.

■ It is true, as Judge Bolger notes, that when we assess the sufficiency of the evidence to support a criminal charge, we are obliged to view the evidence in the light most favorable to sustaining the jury's verdict.[21] But in fulfilling this obligation, we must confine ourselves to *reasonable* interpretations of the evidence.[22] And in deciding what Rantala might have meant by this one particular sentence, we must not take that one sentence in isolation. Rather, we must interpret that sentence in light of Rantala's statements to Mischler as a whole.

Viewing Rantala's words as a whole, the only reasonable interpretation is that Rantala was urging Mischler to tell the authorities that she would not voluntarily cooperate in the proposed burglary prosecution—that she had nothing to say in the absence of a subpoena. It is simply unreasonable to take one sentence from the middle of Rantala's statement and interpret it as a request for Mischler to unlawfully refuse to answer questions under different circumstances—that is, refuse to answer in the event that she was later subpoenaed and called as a witness before the grand jury.

Judge Bolger also relies on the fact that, at one point in Rantala's conversation with Mischler, Rantala told her, "If you don't want to answer, say 'no'." Judge Bolger suggests that this statement could be interpreted as a request for Mischler to simply refuse to answer unfavorable questions, even if she chose to testify under oath to the grand jury. Again, we do not believe that this suggested interpretation is reasonable.

All told, Rantala spoke with Mischler for more than half an hour. He repeatedly asked Mischler not to cooperate with the burglary investigation, and not to testify voluntarily to the grand jury if she had not been subpoenaed. Alternatively, Rantala urged Mischler—if she chose to testify—to refrain from elaborating or from volunteering information that was not solicited by the questions, and to confine herself to "yes" or "no" answers to the extent possible. As we have already explained, all of this was lawful; it did not constitute witness tampering.

Against this backdrop, and in the midst of their conversation, Rantala uttered one sentence—"If you don't want to answer, say 'no'."—that might be interpreted as a request for Mischler to unlawfully withhold testimony. But this interpretation would require us to ignore the context of the lengthy conversation as a whole.

Our conclusion, that it would be unreasonable to interpret Rantala's one isolated sentence in the manner suggested by Judge Bolger, is bolstered by the fact that, when the prosecutor argued Rantala's case to the jury, she never mentioned this particular sentence. From the prosecutor's silence on this subject, one can infer that the prosecutor did not view this isolated sentence as a substantive departure from what Rantala had been saying to Mischler. Rather, the prosecutor viewed this sentence as simply part of Rantala's three main requests to Mischler: urging Mischler not to testify voluntarily, asking Mischler to tell the authorities that she did not want to pursue the charge, and asking Mischler to give "yes" or "no" answers.

As the prosecutor made clear in her summation, the State's theory of this case was that *these* three requests were the conduct that violated the witness tampering statute. The prosecutor never argued that Rantala's one sentence, "If you don't want to answer, say 'no'," constituted a new and different *actus reus*. In other words, the prosecutor never argued the theory now advanced by Judge Bolger: that this one isolated sentence

21. *See, e.g., Newsom v. State,* 199 P.3d 1181, 1188 (Alaska App.2009).

22. *See, e.g., Hinson v. State,* 199 P.3d 1166, 1170 (Alaska App.2008); *Dailey v. State,* 65 P.3d 891, 898 (Alaska App.2003).

constituted a direct request for Mischler to simply refuse to answer questions under oath if she did not wish to answer them.

(We further note that, even if this one isolated sentence could reasonably be interpreted as Judge Bolger suggests, Rantala would still be entitled to a reversal of his conviction, although the State would be entitled to re-try him. Rantala's conviction would still have to be reversed because the prosecutor never argued that Rantala should be convicted based on the one sentence that Judge Bolger has identified. Rather, the prosecutor argued that Rantala should be convicted under the three theories that we have discussed and rejected in this opinion.

The jurors in Rantala's case returned a general verdict. They were not asked to specify the precise conduct that they relied on when they found Rantala guilty of witness tampering. Even if the one sentence identified by Judge Bolger conceivably might have been a proper basis for finding Rantala guilty, there would still be a substantial chance that the jury convicted Rantala based on one or more of the three erroneous theories that the prosecutor argued in her summation. Rantala would therefore be entitled to a reversal of his conviction. *See State v. Lobe*, 140 Wash.App. 897, 167 P.3d 627, 631–32 (2007). *See also Love v. State*, 457 P.2d 622, 634 (Alaska 1969) (the test for harmless error is whether the appellate court "can fairly say that the error did not appreciably affect the jury's verdict").

*Conclusion*

None of the three theories that the State relied on to prosecute Rantala for witness tampering were valid. Accordingly, we conclude that Rantala's conviction is unlawful.

The judgement of the superior court is REVERSED.

BOLGER, Judge, dissenting in part.

BOLGER, Judge, dissenting in part.

I agree with the majority opinion's resolution of John Rantala's double jeopardy claim.

1. AS 11.56.540(a)(1).

But I respectfully dissent from the portion of the opinion addressing the sufficiency of the evidence supporting Rantala's conviction for tampering with a witness. I conclude that the record supports Rantala's conviction on the charge that he "knowingly induce[d] or attempt[ed] to induce a witness to testify falsely, offer misleading testimony, or unlawfully withhold testimony in an official proceeding." [1]

As noted in the majority opinion, Teri Mischler told Rantala during their second telephone conversation that she had not yet received a subpoena. Rantala then told Mischler:

> Then you don't even have to say anything to them. You could just say, "Oh yeah he came in through the window, but" . . . just say "yes" or "no" to them. In fact, you could say "well, *I don't even want to pursue this.*" And they can't do anything about it. Then I can go to court [on the additional misdemeanor charges] and I'll plead guilty to [them] and you'll be out of it. You won't have to deal with this anymore. You understand what I want, trying to do here?

Rantala stressed that Mischler should refuse to testify in front of the grand jury because she had not received a subpoena, and that she should just "tell them 'no, *I don't have anything to say,*'" and "that way they won't indict me." Toward the end of the call, Rantala told Mischler, "if they didn't subpoena you, you don't have to say anything. And whatever you do, don't elaborate on anything. If you're going to say anything, just say 'yes' or 'no.' You know what I mean? *If you don't want to answer, say 'no.'*"

It is possible that Rantala merely intended to tell Mischler that she was not required to testify without a subpoena and that she should not elaborate if she chose to do so. But in determining the sufficiency of the evidence, we must "view the evidence and the inferences to be drawn from that evidence in the light most favorable to upholding the verdict." [2] Viewed in this light, Rantala's statements could also be reasonably inter-

2. *Tipikin v. Anchorage*, 65 P.3d 899, 901 (Alaska App.2003).

preted to mean that, even if Mischler chose to take the stand, she should refuse to answer or simply answer "no" if she did not want to answer a question.

The prosecutor relied on this interpretation of the evidence during her closing argument. She contended that Rantala's suggestion that Mischler should tell the grand jury, "I don't even want to pursue this," amounted to unlawful withholding of testimony. She followed this contention with a legitimate conclusion: "If you haven't been subpoenaed, you don't have to appear. But once you appear, whether or not you have a subpoena, you have to testify truthfully."

We have previously held similar evidence to be sufficient to support a conviction for witness tampering. In *Boggess v. State*, the sole evidence supporting a conviction was the testimony that the defendant told his wife that instead of answering questions before the grand jury, she should "plead the fifth" or "break down and cry." [3] We concluded that this testimony was sufficient to establish that the defendant was guilty of attempting to induce his wife to "unlawfully withhold evidence in an official proceeding." [4]

The same is true in the present case: The jury could have reasonably concluded that Rantala was attempting to persuade Mischler that, if she chose to appear before the grand jury, she should testify in a misleading manner, or illegally withhold testimony. This conclusion would support Rantala's conviction for witness tampering.

**3.** 783 P.2d 1173, 1181 (Alaska App.1989). **4.** *Id.*