BillyJack WIGLESWORTH, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10462.

Court of Appeals of Alaska.

March 11, 2011.

David E. George, Anchorage, for Appellant.

Eric A. Ringsmuth, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

BillyJack Wiglesworth appeals his convictions for first-degree burglary and six counts of second-degree controlled substance misconduct. He argues that the State presented insufficient evidence at his trial to support the jury's finding that he committed burglary. He also argues that he should not have received a separate conviction and sentence for his act of burglary—that his burglary conviction should merge with his drug convictions. For the reasons explained in this opinion, we conclude that the evidence was sufficient to support Wiglesworth's burglary conviction, and we further conclude that, under Alaska law, Wiglesworth's crime of burglary is a separately punishable offense, distinct from his drug offenses.

The more difficult issues in this appeal arise from Wiglesworth's claim that all six of his second-degree controlled substance misconduct convictions should be merged into a single conviction.

The statute defining the offense of second-degree controlled substance misconduct, AS 11.71.020, prohibits several types of conduct. One subsection of the statute prohibits the manufacturing of methamphetamine; *see* subsection (a)(2)(A). Another subsection of the statute prohibits the manufacturing of the immediate precursor chemicals that are created during the process of manufacturing methamphetamine; *see* subsection (a)(2)(B). Yet another subsection of the statute prohibits the possession (as opposed to the manufacturing) of these precursor chemicals if the possessor intends to use them to create methamphetamine; *see* subsection (a)(3).[1]

In addition to these prohibitions on methamphetamine and its immediate chemical precursors, the statute also prohibits the pos-

---

1. The general definition of "immediate precursor" is found in AS 11.71.900(12):

"immediate precursor" means a substance which is by statute or regulation designated as the principal compound commonly used or produced primarily for use, and which is an immediate chemical intermediary used or likely to be used in the manufacture of a controlled substance, the control of which is necessary to prevent, curtail, or limit manufacture of that controlled substance[.]

In addition, AS 11.71.150(f) lists specific precursors of methamphetamine:

(f) [Controlled Substance] Schedule IIA includes, unless specifically excepted or unless listed in another schedule, any material, mixture, or preparation which contains any quantity of the following substances:

(1) immediate precursor to amphetamine and methamphetamine: phenylacetone also known as phenyl–2–propanone; P2P; benzyl methyl ketone; [and] methyl benzyl ketone[.]

session of over two dozen "listed chemicals"—in general, chemical substances that are the raw materials used in manufacturing methamphetamine—if the possessor intends to use these listed chemicals to manufacture methamphetamine or any of its immediate chemical precursors; *see* subsection (a)(4). (The list of these chemicals is found in AS 11.71.200.)

Wiglesworth was convicted of six separate counts of second-degree controlled substance misconduct, based on various subsections of the statute.

One of Wiglesworth's counts was for possessing iodine (one of the listed chemicals) on May 22, 2007 at a beach on the Little Susitna River.

Wiglesworth was convicted of two additional counts, one for possessing iodine and one for possessing acetone (another of the listed chemicals) in a vehicle that was stopped by the police on May 27, 2007.

Wiglesworth was convicted of yet another count of controlled substance misconduct for possessing iodine and red phosphorus (another of the listed chemicals) at a cabin near Willow on June 4, 2007. (Unlike Wiglesworth's two separate counts for possessing iodine and acetone on May 27th, the State did not pursue the June 4th possession of iodine and red phosphorus in separate counts.)

Finally, Wiglesworth was convicted of two more counts of controlled substance misconduct for possessing two different immediate precursor chemicals (amphetamine and pseudoephedrine) at the same cabin on the same date, June 4th.

Wiglesworth argues that he is guilty of essentially one continuing attempt to manufacture methamphetamine, and that his possession of the various listed chemicals and the two methamphetamine precursor chemicals simply reflects a single, ongoing criminal effort. For this reason, Wiglesworth contends that he should be convicted and sentenced for only one merged count of second-degree controlled substance misconduct (based on the jury's guilty verdicts on the six counts).

The State responds that Wiglesworth was properly convicted of a separate count for each individual listed chemical and for each individual precursor chemical. The State also argues that Wiglesworth could properly be convicted of three separate crimes for possessing the same listed chemical—iodine—because Wiglesworth's possession of iodine occurred on three separate dates and locations.

For the reasons explained in this opinion, we conclude that a person engaged in a single act of manufacturing methamphetamine is guilty of only one count of second-degree controlled substance misconduct, even though the defendant might, in the process, manufacture or possess two or more immediate precursor chemicals, or might possess two or more listed chemicals. We further conclude that a defendant's continuing possession of precursor chemicals, or the defendant's continuing possession of a supply of "listed" chemicals, constitutes only one offense, even though the State presents evidence that the defendant possessed those same chemicals at different times and/or different places.

■ Finally, we conclude that if the State believes that the facts of a particular case justify the entry of two or more separate convictions (under the rules stated in the preceding paragraph), the State must prove the facts supporting the separate convictions to the jury beyond a reasonable doubt.

*Underlying facts*

Wiglesworth, along with three confederates (Jess Klein, Karri Embach, and Anafesa Galaktionoff), engaged in the manufacture of methamphetamine using the "ephedrine reduction" method (commonly known as the "REI" method). This method involves the use of several chemicals, including iodine, red phosphorus and ephedrine.

Under this method, pseudoephedrine (a methamphetamine precursor chemical contained in various cold medications) is extracted from the cold medications. Two of the "listed" chemicals—red phosphorus and hydriodic acid (an aqueous solution of hydrogen

iodide)—are then used to chemically alter the pseudoephedrine into methamphetamine.

Of the four defendants in this case, only Wiglesworth knew how to make methamphetamine, and he directed the manufacturing operation.

On or about May 20, 2007, Wiglesworth and his confederates made a trip to Anchorage to buy the supplies needed to manufacture methamphetamine. The next day, the group went to a beach of the Little Susitna River near Houston. At the beach, Klein, Embach, and Galaktionoff set to work extracting red phosphorus from matchbooks, while Wiglesworth readied the iodine. However, while Wiglesworth and his friends were engaged in these efforts, a man drove up in a truck and announced that he was about to close the gate that controlled road access to the beach. The group packed up their materials. Then, before leaving the beach, they set fire to the trash from their manufacturing operation.

On May 22nd, police officers (acting on a tip from a Houston resident) went to the Little Susitna River to investigate the debris at the beach. This debris included discarded matchbook covers and bottles of iodine tincture. The officers concluded that this debris was the trash from a methamphetamine manufacturing operation. Also among the debris was a receipt with the name "Jess Klein".

In the meantime, Wiglesworth and his friends decided to continue their methamphetamine manufacturing efforts at a cabin near Willow; Karri Embach knew about this cabin because it was owned by her ex-boyfriend's father. Wiglesworth and his three friends stayed at the cabin for several days. During this time, they both manufactured and ingested methamphetamine.

At Wiglesworth's trial, Jess Klein testified that, at some point during these several days, the group left the cabin to buy more supplies and to drop off Galaktionoff, who wanted to go elsewhere. The remaining three people— Wiglesworth, Embach, and Klein—returned to the cabin and continued making methamphetamine.

The group left the cabin again on May 27th, traveling in Klein's Toyota Land Cruiser. While they were riding in the Land Cruiser, they were stopped by the Wasilla police. The police officers observed items in the car that appeared to be related to the manufacture of methamphetamine, including various listed chemicals and methamphetamine residue. The police impounded the vehicle, but they let Wiglesworth, Embach, and Klein leave. The police recovered methamphetamine, the precursor chemicals of amphetamine and pseudoephedrine, and the listed chemicals iodine and acetone from the Land Cruiser.

On June 3, 2007, Wiglesworth, Embach, and Klein met again, this time joined by Wiglesworth's friend, Shannon Lovell. Wiglesworth apparently wanted to go back to the cabin and try to clean up the mess caused by their methamphetamine manufacturing activities.

On June 4, 2007, Wiglesworth, Embach, Klein, and Lovell were riding in Lovell's Chevy pickup truck when they were stopped by the Houston police. Again, police observed methamphetamine-related items in the truck, and they impounded the truck. This time, however, the police arrested Wiglesworth and the other occupants.

Following this arrest, Lovell told the police about the cabin near Willow where Wiglesworth had been manufacturing methamphetamine. Lovell led the police to the cabin, and the police then obtained a warrant to search the premises. This search revealed bottles of iodine tincture, evidence of red phosphorus and pseudoephedrine, and other supplies and equipment used to manufacture methamphetamine. Various items from the cabin tested positive for methamphetamine, amphetamine, psuedoephedrine, iodine, and phosphorus.

Based on these events, Wiglesworth was convicted of burglarizing the cabin, and he was also convicted of six counts of second-degree controlled substance misconduct.

One of the drug counts was based on the iodine found among the debris on the beach on May 22nd. Two of the drug counts were based on the iodine and acetone found in the Land Cruiser on May 27, 2007. A fourth drug count was based on the combination of iodine and red phosphorus found at the cabin

on June 4, 2007. And the fifth and sixth drug counts were based on the amphetamine and pseudoephedrine found at the cabin.

*Wiglesworth's claim that the evidence presented at his trial is insufficient to support his burglary conviction*

■ Wiglesworth contends that the evidence presented at his trial is insufficient to support the jury's verdict finding him guilty of burglarizing the cabin. When a defendant claims that the evidence is insufficient to support a criminal conviction, we must view the evidence (and all reasonable inferences to be drawn from that evidence) in the light most favorable to upholding the verdict.[2]

■ Viewing the evidence in that light, the evidence shows that Karri Embach (Wiglesworth's confederate) told Wiglesworth about the cabin and suggested that it was a potential site for their methamphetamine lab. The cabin was owned by Marshal Johnson, the father of a man whom Embach had previously dated. However, Embach had broken up with Johnson's son several months before, and she had not been to the cabin for several months.

Embach stated that she rationalized their use of the cabin because she had lived there before. However, neither Embach nor any of the other defendants actually had permission to use the cabin; Embach admitted as much at Wiglesworth's trial. Embach further testified that she never told Wiglesworth that she had permission to use the cabin. Rather, she told him, "nobody's going to ever think to look for us there."

There was a sign outside the cabin with the name "Johnson". The hasp and lock assembly had been pried off the cabin door. Although Embach stated that someone else had broken the lock, and that the cabin was already open when she and Wiglesworth arrived, the jury was not obliged to credit that testimony.

All of this evidence, viewed in the light most favorable to the jury's verdict, is sufficient to convince reasonable jurors, beyond a reasonable doubt, that Wiglesworth burglarized the cabin (*i.e.*, that he and his friends broke into the cabin, intending to commit a crime within it). Therefore, the evidence is sufficient to support Wiglesworth's burglary conviction.

*Whether Wiglesworth should have received a separate conviction for burglary*

Wiglesworth argues that even if the evidence supports the conclusion that he burglarized the cabin, he should not have received a separate conviction and sentence for burglary. Wiglesworth points out that, according to the evidence, he broke into the cabin for the purpose of manufacturing methamphetamine, and Wiglesworth further points out that he was convicted and sentenced for several methamphetamine-related offenses (*i.e.*, the six counts of second-degree controlled substance misconduct). Based on this, Wiglesworth contends that it is improper to give him a separate conviction and sentence for burglary.

■ Both the Alaska Supreme Court and this Court have addressed the question of whether a defendant can properly receive separate convictions and sentences for both an act of burglary and the ulterior crime(s) that motivated the burglary. The answer under Alaska law is yes—separate convictions and sentences are proper. *See Mead v. State*, 489 P.2d 738, 741–42 (Alaska 1971); *Young v. State*, 848 P.2d 267, 272 (Alaska App.1993); *Reynolds v. State*, 706 P.2d 708, 711 (Alaska App.1985).

Accordingly, we uphold Wiglesworth's separate conviction and sentence for burglary.

We turn now to the more difficult questions that are raised by Wiglesworth's argument that he should not have received six separate convictions and sentences for second-degree controlled substance misconduct.

*Why we conclude that the possession of two or more methamphetamine precursor chemicals and/or "listed" chemicals will support only one conviction for second-degree controlled substance misconduct if the defendant possesses these chemicals in connection with a single methamphetamine manufacturing operation*

■ To resolve Wiglesworth's appeal, we must decide whether the second-degree con-

---

**2.** *See, e.g., Rantala v. State,* 216 P.3d 550, 562 (Alaska App.2009).

trolled substance misconduct statute was intended to authorize separate convictions and sentences for each separate precursor chemical and each separate "listed" chemical that the police find at a single methamphetamine manufacturing operation—or whether, instead, a defendant's possession of various precursor chemicals and "listed" chemicals during the course of a single, continuing effort to manufacture methamphetamine should be viewed as only one offense for purposes of conviction and punishment.

In *State v. Dunlop*, 721 P.2d 604 (Alaska 1986), the Alaska Supreme Court addressed the question of whether a defendant who violates a statute two or more times during a single criminal episode should receive multiple convictions and punishments, or only one. The supreme court suggested that the answer often lies in deciding whether the offense focuses on the culpable mental state with which the defendant acted or, instead, whether the offense focuses on the consequences of the defendant's conduct. *Id.*, 721 P.2d at 608–09.

For offenses involving assaultive conduct, Alaska law often focuses on the consequences of the defendant's conduct—meaning that the defendant can properly receive separate convictions and sentences for each person killed, injured, or placed in fear of injury by the defendant's assaultive act. *See Dunlop*, 721 P.2d at 609–610; *Cooper v. State*, 595 P.2d 648, 650 (Alaska 1979) (upholding separate assault convictions when a defendant's threatening conduct with a weapon placed

three people in fear of imminent serious injury).

Similarly, in *Knutsen v. State*, 101 P.3d 1065, 1071 (Alaska App.2004), this Court upheld eight separate convictions for indecent photography when the defendant secretly videotaped the activities in a women's dressing room—and, in doing so, violated the privacy of eight individuals.

On the other hand, for offenses involving theft, Alaska follows the "single larceny" doctrine—the rule that the defendant's act of taking property belonging to different owners at the same time and place generally constitutes only a single crime of theft, even though this act of theft affects two or more victims. *Nelson v. State*, 628 P.2d 884, 896–97 (Alaska 1981); *Martin v. State*, 797 P.2d 1209, 1218 (Alaska App.1990). In other words, theft offenses generally focus on the fact that the defendant has engaged in an episode of stealing, rather than on the number of people who are deprived of their property as a result of this episode.

Our task in the present case is to identify the gravamen or focus of subsections (2) through (6) of AS 11.71.020(a)—the provisions of the statute dealing with methamphetamine and the chemicals that are either used or created during the process of manufacturing methamphetamine.

The text of these portions of the statute is quite lengthy, so we are placing that text in a footnote rather than in the main text of our opinion.[3] However, we conclude that this

---

**3.** Here are the pertinent provisions of AS 11.71.020:

(a) Except as authorized in AS 17.30, a person commits the crime of misconduct involving a controlled substance in the second degree if the person
. . .
(2) manufactures any material, compound, mixture, or preparation that contains
(A) methamphetamine, or its salts, isomers, or salts of isomers; or
(B) an immediate precursor of methamphetamine, or its salts, isomers, or salts of isomers;
(3) possesses an immediate precursor of methamphetamine, or the salts, isomers, or salts of isomers of the immediate precursor of methamphetamine, with the intent to manufacture any material, compound, mixture, or

preparation that contains methamphetamine, or its salts, isomers, or salts of isomers;
(4) possesses a listed chemical with intent to manufacture any material, compound, mixture, or preparation that contains
(A) methamphetamine, or its salts, isomers, or salts of isomers; or
(B) an immediate precursor of methamphetamine, or its salts, isomers, or salts of isomer;
(5) possesses methamphetamine in an organic solution with intent to extract from it methamphetamine or its salts, isomers, or salts of isomers; or
(6) under circumstances not proscribed under AS 11.71.010(a)(2), delivers
(A) an immediate precursor of methamphetamine, or the salts, isomers, or salts of isomers of the immediate precursor of methamphetamine, to another person with reckless

text is important, because it illuminates the legislative purpose behind the statute.

As we have already explained, the pertinent portions of the statute make it a crime to manufacture methamphetamine, but they also make it a crime to manufacture a chemical precursor of methamphetamine, or to possess one of these chemical precursors with the intent to manufacture methamphetamine. In addition, these portions of the statute make it a crime for a person to possess a "listed chemical" (the various chemicals that are the "raw materials" used in the process of manufacturing methamphetamine) if the person intends to use the listed chemical to manufacture methamphetamine or one of the precursor chemicals.

Taken together, the apparent purpose of these statutory provisions is to define the offense in such a way that it encompasses various acts which otherwise would be punishable only as an *attempt* to manufacture methamphetamine (*i.e.*, conduct that would otherwise be punishable as a lower degree of

offense; *see* AS 11.31.100(d)), and so that the offense encompasses certain additional types of conduct which might otherwise not be punishable at all—conduct that might otherwise be viewed as merely preparation for an attempt to manufacture methamphetamine.

In other words, the apparent intent of the statute is to allow the government to arrest and prosecute methamphetamine manufacturers during the early stages of the manufacturing process, and to prosecute these offenders for a completed crime rather than an attempt.

This interpretation of the statute is borne out by the minutes of the House Judiciary Committee from February 1999, when the Committee was considering House Bill 3 (21st Legislature)—the proposal to reclassify the crime of manufacturing methamphetamine from third-degree controlled substance misconduct to second-degree controlled substance misconduct. During the Judiciary Committee's meeting of February

disregard that the precursor will be used to manufacture any material, compound, mixture, or preparation that contains methamphetamine, or its salts, isomers, or salts of isomers; or
(B) a listed chemical to another person with reckless disregard that the listed chemical will be used to manufacture any material, compound, mixture, or preparation that contains
(i) methamphetamine, or its salts, isomers, or salts of isomers;
(ii) an immediate precursor of methamphetamine, or its salts, isomers, or salts of isomers; or
(iii) methamphetamine or its salts, isomers, or salts of isomers in an organic solution.
. . .
(c) In this section, "listed chemical" means a chemical described under AS 11.71.200.
And here is the text of AS 11.71.200, "Listed chemicals":
Listed chemicals are chemicals that are used in manufacturing a controlled substance in violation of this chapter. Listed chemicals include
(1) anthranilic acid, its esters, and its salts;
(2) benzaldehyde;
(3) benzyl cyanide;
(4) ephedrine, its salts, optical isomers, and salts of optical isomers;
(5) ergonovine and its salts;
(6) ergotamine and its salts;
(7) N-acetylanthranilic acid, its esters, and its salts;
(8) nitroethane;

(9) norpseudoephedrine, its salts, optical isomers, and salts of optical isomers;
(10) phenylacetic acid, its esters, and its salts;
(11) phenylpropanolamine, its salts, optical isomers, and salts of optical isomers;
(12) piperidine and its salts;
(13) pseudoephedrine, its salts, optical isomers, and salts of optical isomers;
(14) 3,4–methylenedioxyphenyl–2–propanone;
(15) any salt, optical isomer, or salt of an optical isomer of the following chemicals:
(A) ethylamine;
(B) hydriodic acid;
(C) isosafrole;
(D) methylamine;
(E) N-methylephedrine;
(F) N-methylpseudoephedrine;
(G) piperonal;
(H) propionic anhydride;
(I) safrole;
(16) acetic anhydride;
(17) acetone;
(18) anhydrous ammonia;
(19) benzyl chloride;
(20) ethyl ether;
(21) hydriotic acid;
(22) hydrochloric gas;
(23) hydrophosphoric acid;
(24) iodine and crystal iodine;
(25) lithium metal;
(26) potassium permanganate;
(27) red phosphorous;
(28) toluene;
(29) 2–butanone (or methyl ethyl ketone).

17, 1999, the sponsor of House Bill 3 (Representative Tom Brice) told the Committee:

> Currently, state statutes prohibit law enforcement from arresting people [who are] making methamphetamines until they are actually producing [the] drug. The chemicals involved [in this process] are dangerous, as is the production process [itself]. [House Bill 3] will criminalize the possession of certain chemicals used in manufacturing methamphetamines, giving law enforcement the ability to be proactive when fighting methamphetamine production in Alaska.

Representative Brice added that employees of the Department of Public Safety (that is, state troopers) asked him to introduce this bill because they were unable to make an arrest until the people running a methamphetamine lab actually started "cooking" the drug. *Ibid.*

The discussion that followed Representative Brice's remarks further highlighted the fact that, by criminalizing the possession of precursor chemicals and listed chemicals, the legislature was trying to authorize law enforcement officials to intervene when the methamphetamine manufacturing process was still in the attempt stage. A major topic of the discussion was whether the legislature should adopt a list of proscribed chemicals at all. Several legislators and witnesses thought that codifying a list of chemicals might be too restrictive, and they discussed alternative ways in which the legislature might criminalize "the attempt". *See* Minutes of the House Judiciary Committee for February 17, 1999, at Log Nos. 1150 and 1566.

Other committee members questioned the fact that House Bill 3 made the possession of precursor chemicals and listed chemicals the same degree of offense as the completed manufacturing of methamphetamine. Some legislators remarked that they found it unusual for an attempt to be punished as severely as the completed crime. *Id.* at Log Nos. 0661 and 1272.

Overall, the Judiciary Committee's discussion of House Bill 3 (which was ultimately enacted as SLA 2000, ch. 73) shows that the committee members viewed the amendments to AS 11.71.020 as comprising a type of attempt statute—even though the degree of offense and the prescribed penalty range would be the same for both the attempt to manufacture methamphetamine and the completed crime.

(Compare AS 11.41.510(a), which defines the crime of second-degree robbery as either the forcible taking of property or the attempted forcible taking of property.)

Because this is the underlying purpose of the statute, the gravamen of the offense is the defendant's act of assembling the necessary raw materials, and/or the act of assembling or manufacturing the precursor chemicals, for the ultimate purpose of manufacturing methamphetamine. The legislature did not perceive a separate, independent societal interest in the defendant's possession of each separate chemical, or in the defendant's accomplishment of each separate stage in the manufacturing process. Rather, the societal interest at stake is to prevent the illicit manufacturing of methamphetamine.

To put the matter in a slightly different way: if a defendant's possession of each individual precursor chemical and listed chemical constituted a separately punishable violation of the statute, then a defendant who completed the manufacturing process (and who used up the precursor chemicals and listed chemicals in this process) would be guilty of only one class A felony (for manufacturing methamphetamine), while another defendant who was intercepted in the middle of the manufacturing process—and who never actually manufactured any methamphetamine—might be guilty of up to a dozen or more class A felonies, depending on how many precursor chemicals and listed chemicals the police found at the manufacturing site. This result appears to be illogical and unsupported by any social policy.

Accordingly, we conclude that a defendant who violates two or more provisions of AS 11.71.020(a)(2)–(6) during the course of a single, continuing effort to manufacture methamphetamine is guilty of only one act of second-degree controlled substance miscon-

duct for purposes of conviction and punishment.

We do not intend to restrict the State's ability to *charge the defendant* with different counts based on different theories of how the defendant's conduct violated the statute. That is, the State may (if it wishes) charge a separate count based on each precursor chemical or listed chemical found in the defendant's possession. But even if the jury finds the defendant guilty of all these different counts, the jury's verdicts must be merged into a single conviction and sentence for second-degree controlled substance misconduct.

*The potential significance of the fact that a defendant possesses precursor chemicals and/or listed chemicals at different times and places*

■ We next address the question of whether the "single conviction and sentence" rule should apply in cases where the defendant possesses precursor chemicals and/or listed chemicals at different times in the same location, or in different locations at the same time, or—as in Wiglesworth's case—in different locations at different times.

Our basic approach to this question is governed by two principles. The first of these principles is the conclusion we reached in the preceding section of this opinion: subsections (2) through (6) of AS 11.71.020(a) define a species of attempt. If a defendant's conduct comprises a single attempt, then the offense should remain a single offense even though the defendant's possession of various chemicals might occur at different times or in different places.

The second of these principles is that "possession" is a continuing course of conduct, not a series of discrete acts—and, thus, when an offense is defined in terms of the defendant's possession of an article or substance, courts normally construe the defendant's continuing possession of the article or substance as a single offense, even though the defendant may possess that article or sub-

stance at different locations at different times.

We applied this principle in *Simmons v. State,* 899 P.2d 931 (Alaska App.1995). The defendant in *Simmons* was convicted of two counts of being a felon in possession of a concealable firearm (a pistol). The evidence showed that Simmons received the pistol in the mail in mid-April 1990, and that shortly thereafter he took the pistol to a shooting range and fired it. Three months later, in July, the police executed a search warrant for Simmons's house; they found the pistol and seized it. Simmons was charged with two separate offenses: one for possessing the pistol in April, and the other for possessing the pistol in July.[4]

On appeal, Simmons argued that he could not lawfully be convicted of two separate offenses for his continuing possession of the pistol. We agreed. *Id.,* 899 P.2d at 935–37.

We noted that "the element of possession implies continuity"—that possession is "a course of conduct, not an act".[5] We further noted the "well settled" doctrine that when a continuing course of conduct is statutorily defined as one offense, "[this] single crime cannot properly be charged as multiple crimes occurring at [discrete] moments in time"—that prosecutors can not circumvent the double jeopardy clause by "dividing a single crime into a series of temporal or spatial units". *Simmons,* 899 P.2d at 936, quoting *Brown v. Ohio,* 432 U.S. 161, 169, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187 (1977).

For these reasons, we held that a defendant can not be convicted of multiple counts alleging possession of the same weapon unless the State proves, beyond a reasonable doubt, that the defendant's possession of this weapon was not continuous—in other words, that the defendant actually engaged in two discrete possessions. *Simmons,* 899 P.2d at 936.

In *Simmons,* there was some evidence suggesting that the defendant had engaged in two separate possessions—that he sold the weapon to another man, and then later took possession of it again. *Id.* at 936–37. Nev-

---

4. *Simmons,* 899 P.2d at 933–34.

5. *Id.* at 936.

ertheless, we held that Simmons could lawfully be convicted of only one count—because "the jury was never required to consider or decide [this] issue":

> Because the [jury] instructions did not apprise the jury [that, to justify two separate convictions, the State needed to prove] that Simmons' possession of the [pistol] had been interrupted at some point between the first alleged offense and the second, the jury's verdicts left the issue unresolved. At this juncture, any ambiguity must be resolved in favor of the accused. [Citation omitted] Accordingly, we conclude that Simmons' two convictions must merge.

*Simmons*, 899 P.2d at 937.

*See also Stewart v. Commonwealth*, 306 S.W.3d 502, 506 (Ky.2010) (holding that continued possession of contraband is a single course of conduct that gives rise to a only single offense); *Fulcher v. Commonwealth*, 149 S.W.3d 363, 376 (Ky.2004) (approving other jurisdictions' conclusion that "uninterrupted possession of the same contraband over a period of time is but one offense constituting a continuing course of conduct, precluding convictions of multiple offenses for possession of the same contraband on different dates"); *State v. Kamaka*, 277 S.W.3d 807, 811–12 (Mo.App.2009) (holding that the defendant's possession of the same computer file of child pornography on two different dates constituted a single offense).

*And see State v. Farr*, 160 N.H. 803, 7 A.3d 1276, 1281–82 (2010) (discussing appellate decisions from around the country on the issue of when separate convictions for possession are legally justified).

■ As we noted earlier, three of Wiglesworth's convictions were based on his possession of iodine (a "listed" chemical) at different locations on different dates. But if these three counts were based on the same supply of iodine that Wiglesworth purchased or procured in furtherance of a single methamphetamine manufacturing operation, then—under the legal principles we have just summarized—Wiglesworth could only be convicted of one act of possession.

As was true in the *Simmons* case, there is some evidence in Wiglesworth's case tending to show that he may have engaged in discrete possessions of iodine. As we explained toward the beginning of this opinion, Wiglesworth was found guilty of possessing iodine on May 22, 2007 at the beach on the Little Susitna River. He was also found guilty of possessing iodine (as well as acetone) in a vehicle five days later, on May 27th. And Wiglesworth was found guilty of a third count of possessing iodine (as well as red phosphorus) at the cabin near Willow on June 4th.

The police seized the iodine and acetone they found in Wiglesworth's vehicle on May 27th. Thus, it is possible that Wiglesworth was forced to purchase more iodine sometime between May 27th and June 4th, when the police found iodine in the cabin. If that was the case, then one could argue that Wiglesworth's possession of iodine on June 4th constituted a separate act from his possession of iodine on May 27th. On the other hand, it is also possible that both the iodine found in the vehicle and the iodine found later in the cabin came from the same, larger supply—that each cache of iodine was only a different manifestation of the same act of possession.

This issue went unlitigated and unresolved at Wiglesworth's trial. Therefore, under our decision in *Simmons*, the ambiguity must be resolved against the government and in Wiglesworth's favor.

In the same vein, Wiglesworth's activity at the beach on the Little Susitna River and his later activity at the cabin near Willow may have been separate, discrete attempts to manufacture methamphetamine. On the other hand, these activities may have constituted one continuing (albeit interrupted) attempt to manufacture methamphetamine—with an early stage (the effort to synthesize hydriodic acid from red phosphorus and iodine) taking place at the beach, and a later stage (the effort to create the completed methamphetamine) taking place at the cabin. Again, this issue went unlitigated and unresolved at Wiglesworth's trial—and, thus, the ambiguity must be resolved against the government and in Wiglesworth's favor.

There are, perhaps, other theories under which Wiglesworth might be guilty of separately punishable acts of "possession" for purposes of AS 11.71.020. But as we have explained, the facts justifying separate convictions would have to be expressly pleaded by the State and found by the jury. When the facts (as found by the jury) are ambiguous as to whether a defendant has committed one offense or two, the defendant should receive only a single conviction and sentence.[6] Accordingly, any arguments concerning how the facts of Wiglesworth's case might justify separate convictions for second-degree controlled substance misconduct are moot.

*Conclusion*

We conclude that the evidence presented at Wiglesworth's trial supports his conviction for burglary, and we further conclude that Wiglesworth could properly be convicted separately of both this act of burglary and the controlled substance misconduct that was the ulterior motive for the burglary. However, we conclude that the six jury verdicts finding Wiglesworth guilty of second-degree controlled substance misconduct must be merged into a single conviction and sentence.

We therefore remand this case to the superior court so that the judgement against Wiglesworth can be amended to reflect one conviction for controlled substance misconduct, and so that the superior court can re-sentence Wiglesworth. *See Allain v. State,* 810 P.2d 1019, 1021–22 (Alaska App.1991).

---

**6.** *See Cronce v. State,* 216 P.3d 568, 570 (Alaska App.2009); *Atkinson v. State,* 869 P.2d 486, 495 (Alaska App.1994); *Horton v. State,* 758 P.2d 628, 632 (Alaska App.1988) (noting that the State has the burden of proving each offense beyond a reasonable doubt); *see also Mill v. State,* 585 P.2d 546, 552 n. 4 (Alaska 1978) ("In marginal cases[,] doubts should be resolved against turning a single transaction into multiple offenses").